UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 13-CR-0108-CVE |
| | ) | |
| GENE EDWARD FOUSE, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Now before the Court is defendant Gene Edward Fouse's[1] motion to suppress.  Dkt. ## 22,

23.[2]  A suppression hearing was held on August 5, 2013, at which Oklahoma Highway Patrol (OHP)

Trooper Colby Rohr testified.

## I.

Defendant is a truck driver, based in California, and, on May 28, 2013, defendant and his co-

driver Reginald "Reggie" Mason allegedly left Calipatria, California to deliver onions to Brighton,

Michigan.  On May 30, 2013, defendant was driving eastbound on Interstate 44 (the Turner

---

[1]      It appears that defendant's name on his birth certificate may have been incorrectly spelled
as Fouse; however, his family name is Foust and that is the name on his driver's license.

[2]      Defendant's motion was originally filed as a motion to suppress (Dkt. # 22) and brief in
support (Dkt. # 23); however, the motion, which included a motion for hearing (Dkt. # 24),
was thereafter split into a two-part motion in CM/ECF.  The motion for hearing (Dkt. # 24)
was rendered moot after the hearing was held.  Additionally, defendant's exhibits A and B,
which are identical partial DVD recordings of the first part of the stop, were submitted
separately.  Dkt. # 25.  With its response (Dkt. # 27), the government submitted exhibits A
and B.  Dkt. # 29.  Exhibit A is identical to defendant's submissions; however, exhibit B is
a recording of the second part of the traffic stop.  These latter exhibits were admitted into
evidence at the suppression hearing as government exhibits 1 and 2, and the Court has
reviewed the entirety of both exhibits.

Turnpike), and he entered the toll gate near mile marker 183. Mason was sleeping. Rohr was seated in his patrol car facing oncoming traffic in the toll plaza, and he observed defendant fail to signal a lane change. Rohr saw that defendant was driving a tractor-trailer marked Magiq Transportation on the side, and he was able to see a Department of Transportation (DOT) number on the side, which he ran through a safety website called Safer. The website provided a snapshot of the company, which alerted him that the company drove only 10,000 miles in 2011. However, Rohr knew that an average professional driver drives between 100,000 and 110,000 miles per year. He also noticed that the company was based in Las Vegas, Nevada but the tractor and trailer had California plates. Rohr explained at the hearing that criminals sometimes register vehicles in a different place than the company headquarters to prevent law enforcement from tracking them.

Defendant paid the toll and continued eastbound. At approximately 7:20 a.m., Rohr stopped defendant's truck. Rohr testified that he stopped defendant because defendant failed to signal a lane change as he approached the toll booth.

After defendant pulled the truck to the side of the road, Rohr approached the passenger side of the truck. Rohr requested driver's licenses and log books for both defendant and Mason. Rohr testified that, although Mason was asleep when Rohr first approached, Mason thereafter awoke. Rohr testified that defendant was nervously "hustling" around in the truck looking for his papers. Defendant confirmed with Rohr that defendant had been stopped for failing to signal a lane change. Rohr requested that defendant accompany Rohr to his patrol car, which defendant agreed to do, and Rohr thereafter checked both defendant's and Mason's driver's licenses, registrations, and log books. Mason remained in the truck. While Rohr and defendant were in the patrol car, Rohr reminded defendant that he was required to signal a lane change at all toll booths, and defendant

apologized that he had not been paying attention while driving.  Rohr noted that, although defendant

had stated that he and Mason loaded the truck, defendant's log did not show that he had loaded, and

Mason had signed the bill of lading.  Further, Rohr noted that Mason drove only five hours before

defendant was signed back on duty to drive, according to the log books, even though a driver is

allowed to drive eleven hours, and drivers typically drive the full eleven hours so that a team can

keep the truck in motion at all times.  Rohr found that the last entry in both log books was May 29,

2013 at 7:30 a.m., and the last entry stated that defendant and Mason were in California on May 29;[3]

however, the book should have had an entry for May 30.  Rohr explained that drivers will hide

downtime, or "disappear" off the log books, because they load their product but then have to wait

for a load of illegal narcotics to be delivered.  Rohr also learned that Mason had an outstanding

traffic ticket in New Mexico and that defendant had a protective order against him in California.

　　　After completing the warning citation, Rohr returned defendant's driver's license,

registration, and other documents to him, and defendant exited Rohr's vehicle.  Before defendant

closed the passenger door, Rohr said "Hey Gene! Can I talk to you for a moment, if you don't

mind?"  Defendant agreed and returned to the passenger seat of Rohr's vehicle.  Rohr asked

defendant about Mason's and defendant's criminal history, the protective order against defendant,

defendant's relationship with Mason, and defendant's prior contacts with law enforcement as a truck

driver. Rohr asked defendant whether defendant had anything illegal in the truck, including alcohol,

marijuana, cocaine, or heroin, and asked for permission to search the truck.  Defendant stated that

he did not have a problem with Rohr searching the truck, but asked Rohr why he felt that he needed

---

[3]     This is contrary to defendant's statement on the recording that "they" loaded on "Tuesday,"
        or May 28.

to do so.  Defendant then stated that Rohr could search the truck "if you have to."  Rohr said to defendant that usually, when drivers were "behind time," it gave drivers extra time to "do things they shouldn't be doing."  Rohr stated that he wanted to check and make sure that defendant was not traveling with illegal narcotics.  Defendant said "I don't have a problem with your search."  Defendant stated that the same situation happened to him in Texas the previous day - - he did not receive a warning, but the officer had checked the truck.  Upon questioning by Rohr, defendant stated that the Texas officer who stopped him was wearing a cowboy hat - - something Texas Department of Public Safety (DPS) officers wear, according to Rohr.  Rohr said that Texas DPS officers act like OHP troopers and would have given defendant some documentation if he had been stopped.  Rohr said, "if you're good with me searching the truck and the trailer, I'd like to do that."  Defendant said "ok, yeah" and asked whether Rohr was going to bring "the dogs and the everything" because defendant was behind time.  When Rohr confirmed that he could search defendant's truck, defendant said "Come on. Let's do it."  Rohr stated that he would let defendant and Mason sit in the patrol car while he searched.  Defendant attempted to convince Rohr that he should accompany Rohr to the truck to retrieve a few things, including his cell phone.  Rohr told defendant that, for safety reasons, defendant needed to remain in the patrol car.  Mason was asked to sit in the patrol car while officers searched the truck.  Just before beginning the search, and outside of the patrol car, Rohr stated, to another officer, that he thought that he had smelled marijuana in the tractor.  Rohr and other officers searched the tractor and trailer and found approximately twelve kilograms of cocaine in a backpack under the sleeping area of the tractor.[4]

---

[4]     At the hearing, the parties stipulated that the substance seized was approximately 12 kilograms of cocaine.

## II.

Defendant argues that the initial stop, the length of the stop, and the secondary questioning - - after defendant re-entered the patrol car - - were all improper.  Further, defendant asserts that he was in custody and was being interrogated such that Miranda[5] applied.  The government responds that all police actions were proper and did not violate defendant's rights and that Miranda was inapplicable because defendant was not in custody.

## A.

Defendant argues that Rohr lacked reasonable suspicion to stop the truck.  A traffic stop is a seizure, and does implicate a person's Fourth Amendment rights.  Whren v. United States, 517 U.S. 806, 809 (1996); Berkemer v. McCarty, 468 U.S. 420, 436-37 (1984).  However, a traffic stop is characterized as an investigative detention rather than a custodial arrest.  Berkemer, 468 U.S. at 436-37; United States v. Hunnicutt, 135 F.3d 1345, 1348 (10th Cir. 1998) (citation omitted). Further, a traffic stop, while it is "subject to the constitutional imperative that it not be 'unreasonable' under the circumstances . . . is reasonable where the police have probable cause to believe that a traffic violation has occurred."  Whren, 517 U.S. at 810 (citations omitted). Additionally, the reasonableness of a traffic stop does not "depend[ ] on the motivations of the individual officers involved."  Id. at 813.  Where a traffic stop is "based on an observed traffic violation . . . [or] if the officer has a reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring," the traffic stop is valid.  Hunnicutt, 135 F.3d at 1348 (citation omitted); United States v. Botero-Ospina, 71 F.3d 783, 787 (10th Cir. 1995).  In other

---

[5]       Miranda v. Arizona, 384 U.S. 436 (1966).

words, the court's "sole inquiry is whether this particular officer had reasonable suspicion that this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction." Id. at 787 (quotation marks omitted).  "This is purely an objective assessment; the officer's subjective motivations for the stop are irrelevant." United States v. Bryant, 100 Fed.Appx. 788, 790 (10th Cir. 2004) (citing Botero-Ospina, 71 F.3d at 787) (unpublished).[6]  Further, the officer need not be correct in his suspicion, but need only have a reasonable suspicion of a violation.  United States v. Callarman, 273 F.3d 1284, 1287 (10th Cir. 2001).

In a routine traffic stop based upon an observed traffic violation, as long as the detention is temporary, lasts no longer than necessary to effectuate the purpose of the stop, and the scope of the detention is tailored to the underlying justification, the stop is reasonable.  United States v. Wood, 106 F.3d 942, 945 (10th Cir. 1997); see Terry v. Ohio, 392 U.S. 1, 18-20 (1968).  "During a traffic stop . . . a police officer is permitted to ask such questions, examine such documentation, and run such computer verifications as necessary to determine that the driver has a valid license and is entitled to operate the vehicle." Wood, 106 F.3d at 945 (citing United States v. Miller, 84 F.3d 1244 (10th Cir. 1996)).  "In appropriate circumstances, to ensure the officer's safety, the officer may obtain information regarding the detainee's criminal history." Id. (citing United States v. McRae, 81 F.3d 1528, 1536 n.6 (10th Cir. 1996)).  Therefore, "[t]o determine the reasonableness of an investigative detention, [courts] make a dual inquiry, asking first 'whether the officer's action was justified at its inception,' and second 'whether it was reasonably related in scope to the circumstances which justified the interference in the first place.'" Hunnicutt, 135 F.3d at 1348

---

[6]      This and other unpublished decisions are not precedential, but are cited for their persuasive value.  See Fed. R. App. P. 32.1; 10th Cir. R. 32.1.

(quoting Terry, 392 U.S. at 20). A police officer may extend the length of the traffic stop for questioning beyond the initial purpose of the traffic stop only if the officer has "an objectively reasonable and articulable suspicion that illegal activity has occurred, or the driver voluntarily consents to further questioning." United States v. Ramirez, 479 F.3d 1229, 1243 (10th Cir. 2007).

It is a violation of Oklahoma law to fail to signal a lane change when moving into toll areas or within toll areas. Okla. Stat. tit. 47, § 11-309(2); United States v. Kitchell, 653 F.3d 1206, 1216 (10th Cir. 2011) ("[T]he Tenth Circuit, applying Oklahoma law[ ] . . . has concluded that a turn signal is always required when entering a toll-both area from the main turnpike." (citation omitted)). There is no dispute that defendant's vehicle was stopped for failing to signal a lane change, but defendant does not admit that this traffic violation actually occurred.  Rohr testified that he was in his patrol car facing oncoming traffic within the toll plaza when he observed defendant's failure to signal a lane change.  In the video recording of the stop, after defendant pulled over and Rohr approached the passenger side of the truck, defendant did not contest that he failed to signal a lane change - - instead, he questioned Rohr about when he should have signaled.  The Court finds Rohr's testimony credible and finds that Rohr's testimony regarding the observed traffic violation is a sufficient basis to determine that Rohr properly stopped defendant's truck after observing defendant's traffic violation.

The Court must also consider whether the length of the traffic stop was reasonable under the second prong of Terry.  An officer conducting a traffic stop may request a driver's license, vehicle registration, run a computer check, and issue a citation.  See United States v. Zubia-Melendez, 263 F.3d 1155, 1161 (10th Cir. 2001).  An officer may also "ask questions about the motorist's travel plans and authority to operate the vehicle," in addition to obtaining the relevant documentation,

7

without exceeding the scope of an investigative detention.  United States v. Alcaraz-Arellano, 441 F.3d 1252, 1258 (10th Cir. 2006).  Such questioning does not violate the Fourth Amendment as long as the questioning does not prolong the traffic stop.  United States v. Villa, 589 F.3d 1334, 1339 (10th Cir. 2009); United States v. Wallace, 429 F.3d 969, 974 (10th Cir. 2005).  Here, the stop lasted long enough for Rohr to check defendant's and Mason's driver's licenses, registration, and log books, and no longer; therefore, the length of the initial questioning and stop was reasonable.

**B.**

Defendant argues that Rohr improperly extended the stop when he asked defendant if he could ask more questions, after returning defendant's log book, driver's license, and other paperwork.  The government argues that several circumstances justified Rohr's reasonable suspicion and allowed Rohr to continue the traffic stop beyond its initial purpose.  In the alternative, the government asserts that the stop was long enough for Rohr to check defendant's documentation and records only.  Thereafter, defendant exited the vehicle, and defendant consented to the further conversation with Rohr.

"After the purpose of the traffic stop is completed, further detention for purposes of questioning unrelated to the initial traffic stop is impermissible unless: (1) the officer has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring, or (2) the initial detention has become a consensual encounter."  United States v. Bradford, 423 F.3d 1149, 1156-57 (10th Cir. 2005).  Police must have reasonable suspicion that criminal activity is afoot to continue a traffic stop beyond the purpose of issuing a warning or citation for the traffic violation.  United States v. Kopp, 45 F.3d 1450, 1453 (10th Cir. 1995).  Reasonable suspicion is a "particularized and objective basis for suspecting the person stopped of criminal activity."  Ornelas

8

v. United States, 517 U.S. 690, 696 (1996) (internal quotation marks omitted).  An "inchoate and unparticularized suspicion or 'hunch' is insufficient" to support reasonable suspicion.  United States v. Hall, 978 F.2d 616, 620 (10th Cir. 1992) (internal quotations and citations omitted).  Reasonable suspicion "represents a minimum level of objective justification which is considerably less than proof of wrongdoing by a preponderance of the evidence." Alcaraz-Arellano, 441 F.3d at 1260 (quoting United States v. Mendez, 118 F.3d 1426, 1431 (10th Cir. 1997)).  In determining whether an officer had reasonable suspicion of criminal activity, the Court does not evaluate the facts in isolation but instead construes them together based on the totality of the circumstances.  United States v. Arivizu, 534 U.S. 266, 274 (2002).

The government argues that Rohr could have considered defendant's nervousness as an indication that defendant was involved in illegal activity.  Extreme nervousness of a driver or passenger, in combination with other factors, can be a factor used to establish reasonable suspicion to continue a traffic stop beyond its initial purpose.  United States v. Salazar, 609 F.3d 1059, 1068-69 (10th Cir. 2010).  However, this factor must be considered with other factors, and it may not be used as the sole factor to establish reasonable suspicion.  In United States v. Simpson, 609 F.3d 1140 (10th Cir. 2010), the Tenth Circuit stated:

> "We have held consistently that nervousness is 'of limited significance' in determining whether reasonable suspicion exists." . . . Nervousness is of limited value in assessing reasonable suspicion for two reasons.  First, it is common for most citizens, "whether innocent or guilty-to exhibit signs of nervousness when confronted by a law enforcement officer." . . . Further, it is natural for a motorist to become more agitated as a stop is prolonged and particularly when the officer seems skeptical or suspicious.
>
> Second, unless the police officer has had significant knowledge of a person, it is difficult, even for a skilled police officer, to evaluate whether a person is acting normally for them or nervously.

Id. at 1147-48 (citations omitted).  The Tenth Circuit clarified that "[e]xtreme and persistent nervousness . . . 'is entitled to somewhat more weight,'" but a court may not rely solely on a police officer's perception of nervousness and must find objective indicators of extreme nervousness.  Id. at 1148.

Rohr testified that defendant was unusually nervous when Rohr talked to him while defendant was still seated in the driver's seat of the truck.  Rohr also stated that defendant remained nervous - - something that is unusual for truck drivers because they encounter law enforcement often.  Rohr testified that defendant also got more nervous, even after Rohr told him that he would receive only a warning that would not affect his Class A license.  A review of the video recording reveals that defendant engaged Rohr in conversation at points and looked as if he was about to fall asleep at other times.  Defendant was also breathing very heavily and making nervous gestures, including rubbing his face.  Rohr testified that falling asleep may be a sign of extreme anxiety or nervousness because, when coupled with the stress of driving for long periods of time, the stress of talking to an officer will tire someone to the point of falling asleep.  Based on a review of the video recording of the traffic stop from Rohr's dashboard camera, the Court finds objective indicators of extreme nervousness based on the heavy breathing and facial rubbing by defendant.

The government argues that other circumstances, when viewed as a whole, raised suspicion that defendant was trafficking illegal drugs.  In particular, the government points to the inconsistencies in the log books and Mason's failure to pay his traffic ticket in New Mexico, as well as the outstanding protective order against defendant in California.[7]  Rohr stated that Mason's ticket

---

[7]     The Court finds that the protective order is irrelevant to the analysis of reasonable suspicion of drug activity in this case.

raised his suspicions because professional truck drivers generally avoid having open fines that could threaten their profession.  The inconsistencies in both defendant's and Mason's log books were especially important to Rohr because both log books were missing an entire day.  The last entry was on May 29 at 7:30 a.m.; however, the trip from California to Stroud, Oklahoma, where defendant was stopped, takes approximately 19 hours, according to Rohr.  Thus, Rohr testified that it seemed defendant and Mason were "hiding" lost time.[8]  Rohr testified that "legit" truck drivers sometimes "hide" time to make it appear that they are driving more than they really are, in an attempt to make more money; other drivers hide down time or time not spent driving to wait for delivery of illegal drugs to take as part of an otherwise legitimate delivery.  Further, Rohr testified that, although defendant stated that both he and Mason loaded the truck, only Mason had noted in his log loading the truck and only Mason had signed the bill of lading.  Rohr also testified that, before he initiated the traffic stop, he checked the DOT number on the trailer, and learned that Magiq Transportation owned the trailer and that it was an owner-operator company, which is a sign, in his experience, that a driver may be trafficking illegal drugs.  Drivers trafficking illegal drugs choose to work for owner-operator companies because drivers for those companies have more freedom in their schedules and loads, especially as compared to driving for large companies.  Finally, the government asserts that defendant was traveling an interstate that is commonly used to transport illegal drugs.

The Tenth Circuit has repeatedly affirmed the use of unusual or implausible travel plans to establish reasonable suspicion.  United States v. White, 584 F.3d 935, 950 (10th Cir. 2009) ("Implausible travel plans can contribute to reasonable suspicion . . .").  However, courts have

---

[8]      Rohr also found it suspicious that defendant drove a mere five hours, when truck drivers are allowed to drive eleven, before Mason began driving.

overwhelmingly determined that mere travel along a certain highway is not enough to raise suspicion that someone is trafficking illegal drugs. United States v. Simpson, 609 F3d 1140, 1152 n.3 (10th Cir. 2010) ("We also give no credence to Trooper Bowles's testimony that [defendant] was traveling on a major 'drug corridor." . . . 'Because law enforcement officers have offered countless cities as drug source cities and countless others as distribution cities, however, the probativeness of a particular defendant's route is minimal.'" (quoting United States v. White, 584 F.3d 935, 951-52 (10th Cir. 2009) (citation omitted))). Rohr testified that the totality of the circumstances - - the "owner-operator" status of the company; the license plate versus registration discrepancy; the company low mileage reported for 2011 on Safer; defendant's initial and continued nervousness; defendant's suspicious travel narrative; defendant's and Mason's failure to have updated log books; Mason's failure to pay a traffic ticket in New Mexico; and defendant's failure to inquire about whether the warning would affect his Class A license - - gave him reasonable suspicion that defendant was involved in trafficking illegal drugs. The Court finds that Rohr had reasonable suspicion to continue the detention.

Further, or in the alternative, the government contends that the traffic stop became a consensual encounter, which did not require reasonable suspicion. The government states that Rohr returned defendant's driver's license and documentation before asking any further questions and Rohr did not constrain defendant by any overbearing show of authority. At the hearing, defense counsel argued that Rohr raised his voice and used an overbearing or harsh tone that would lead a reasonable person to feel he was not free to leave. Specifically, defendant argued that, when Rohr said defendant's name, Rohr raised his voice.

12

"If an encounter between an officer and a driver ceases to be a detention and becomes consensual, and the driver voluntarily consents to additional questioning, no further Fourth Amendment seizure or detention occurs." Bradford, 423 F.3d at 1158. "A traffic stop may become a consensual encounter, requiring no reasonable suspicion, if the officer returns the license and registration and asks questions without further constraining the driver by an overbearing show of authority." Id.; West, 219 F.3d at 1176 (10th Cir. 2000). The inquiry should be whether "a reasonable person under the circumstances would believe he was free to leave or disregard the officer's request for information." United States v. Wallace, 429 F.3d 969, 974-75 (10th Cir. 2005) (quotation omitted). In other words, a consensual encounter requires the "voluntary cooperation of a private citizen in response to non-coercive questioning by a law enforcement official." United States v. Patten, 183 F.3d 1190, 1194 (10th Cir. 1999) (quotation omitted). "An officer is not required to inform a suspect that he did not have to respond to his questioning or that he was free to leave." United States v. West, 219 F.3d 1171, 1176-77 (10th Cir. 2000). Where the encounter happens is a factor, Bradford, 423 F.3d at 1158-59, as is what the officer says and his tone of voice. See West, 219 F.3d at 1176. However, the mere fact that defendant is "sitting in [a] . . . patrol car, without more, does not make [defendant's] consent involuntary." United States v. Gigley, 213 F.3d 509, 514 (10th Cir. 2000); Bradford, 423 F.3d at 1158.

At the time that Rohr began questioning defendant for the second time, defendant had his documents and license and was told "That's it! Take care!" Defendant had fully exited the vehicle. Then, Rohr asked if defendant would speak with him for a moment if he didn't mind. Although Rohr called defendant's name ("Hey Gene!") at a level slightly louder than conversational, Rohr raised it so that he could be heard over the noise of the traffic. Rohr's tone was not harsh, and Rohr,

13

once he had defendant's attention, returned to a conversational tone of voice.  Defendant was not subjected to any overbearing authority that compelled his compliance with Rohr's request, and defendant was free to ignore or decline Rohr's invitation to speak further.  The Court finds that traffic stop became a consensual encounter that no longer required reasonable suspicion.

### C.

Defendant asserts that his consent to search the truck was not valid.  "'Voluntary consent' consists of two parts: (1) the law enforcement officers must receive either express or implied consent, and (2) that consent must be freely and voluntarily given." United States v. Jones, 701 F.3d 1300, 1317 (10th Cir. 2012) (citations omitted).  "In determining the voluntariness of consent, the Fourth Amendment requires that 'a consent not be coerced, by explicit or implicit means, by implied threat or covert force.'" Id. (citing Schneckloth v. Bustamonte, 412 U.S. 218, 228 (1973)).  The government bears the burden to establish by a preponderance of the evidence that consent was given freely and voluntarily.  See United States v. Burciaga, 687 F.3d 1229, 1230 (10th Cir. 2012) (finding the government bore the burden to establish "that reasonable suspicion supported the officer's stop of [d]efendant's vehicle." (citation omitted)); United States v. Romero, 247 Fed. Appx. 955, 960 (10th Cir. 2007) (unpublished) (finding burden was by preponderance of the evidence in case involving voluntary consent to search residence); United States v. Lopez-Guzman, 145 Fed. Appx. 627, 628-29 (10th Cir. 2005) (unpublished) (same).  Whether consent was voluntary is a question of fact "to be determined from the totality of all the circumstances."   See also United States v. Harrison, 639 F.3d 1273, 1278 (10th Cir. 2011); Jones 701 F.3d at 1317.  The Tenth Circuit has found that a "two-part test" should guide this inquiry: "[t]he government must (1) 'proffer clear and positive testimony that consent was unequivocal and specific and freely and intelligently given,' and

14

(2) the officers must have used no 'implied or express duress or coercion.'" United States v. Sanchez, 608 F.3d 685, 690 (10th Cir. 2010) (quoting United States v. Taverna, 348 F.3d 873, 878 (10th Cir. 2003)).

Having viewed the entire video recording of the officer's stop of defendant's vehicle, the Court finds that defendant's consent was expressly and voluntarily given.  Defendant stated, multiple times, that Rohr could search the truck.  And, Rohr repeatedly confirmed with defendant that Rohr could search the tractor and trailer.  Rohr did not attempt to coerce defendant to consent and, in fact, explained why he suspected defendant might be trafficking illegal drugs.  Although defendant had questions about the necessity for the search, he ultimately stated "Come on.  Let's go."  He gave express consent, and, under the totality of the circumstances, his consent was voluntary.

## D.

Defendant's final argument is that warnings pursuant to Miranda v. Arizona, 384 U.S. 436 (1966), were required during the continued detention before the search of the vehicle, and, because Rohr failed to give those warnings, defendant's statements should be suppressed.  The government responds that the investigative detention did not become an arrest or custody for the purposes of Miranda warnings because defendant voluntarily consented to return to the patrol car and continue talking with Rohr.  An investigative detention may be "transformed" into an arrest under the Fourth Amendment under certain circumstances.  United States v. Hamilton, 587 F.3d 1199, 1215 (10th Cir. 2009).  "[I]f police officers' actions exceed what is reasonably necessary under the totality of the circumstances, the stop may only be justified by probable cause or consent."  United States v. Melendez-Garcia, 28 F.3d 1046, 1051 (10th Cir. 1994).  The transformation may occur due to the use of handcuffs, firearms, or other police techniques inconsistent with the limited scope of an

15

investigation detention, or the detention may become so lengthy that the investigation detention escalates into a de facto arrest. White, 584 F.3d at 952-53.

A defendant's statement is generally inadmissible if law enforcement officers elicited the statement during a custodial interrogation without first giving the prescribed warnings and obtaining a waiver of defendant's rights. Miranda, 384 U.S. at 444. A person is in custody if the person is "deprived of his freedom by the authorities in any significant way." Id. at 478. In assessing whether a person was "in custody," the only relevant question "is how a reasonable man in the suspect's position would have understood his situation." Berkemer, 468 U.S. at 422. But, even when a person is in custody, the person must still be subject to "interrogation" before Miranda protections apply. "[T]he Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980). "[T]he term 'interrogation' under Miranda refers not only to express questioning, but also any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Id. at 301. Therefore, questions about a person's name and address are generally not subject to Miranda protections. United States v. Lara-Garcia, 478 F.3d 1231, 1235 n.3 (10th Cir. 2007); United States v. McCurdy, 40 F.3d 1111, 1115 (10th Cir. 1994) ("'[d]isclosure of name and address is essentially a neutral act,' and 'it would be the 'extravagant' extension of the privilege . . . to hold that it is testimonial in the Fifth Amendment sense.'" (quoting California v. Byers, 402 U.S. 424, 431-32 (1971) (alterations in McCurdy))).

While Rohr was asking questions that might rise to the level of interrogation, defendant was not in custody such that Miranda would apply. Defendant was seated in a patrol car; however, he

16

was clearly free to leave - - he voluntarily re-entered the patrol car to talk to Rohr upon Rohr's request.  Further, it was misting[9] and the patrol car was on the side of a noisy and busy highway;[10] therefore, Rohr had a reasonable basis to question defendant inside the patrol car rather than on the side of the road.  Finally, defendant was not restrained in any way, Rohr did not act in a coercive or intimidating manner, and the discussion was relatively short.  Only after officers found the cocaine in the truck was defendant arrested and placed in handcuffs.  Thereafter, officers read defendant his Miranda rights and formally questioned defendant in the patrol car.  Therefore, Miranda was inapplicable to any statements made after defendant voluntarily re-entered the patrol car until the search of the vehicle, and the motion to suppress should be denied.

**IT IS THEREFORE ORDERED** that defendant's motion to suppress (Dkt. ## 22, 23) is **denied**.

**DATED** this 6th day of August, 2013.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE

---

[9]     Rohr testified that it had rained earlier that day but, at the time of the stop, it was only misting.

[10]    Rohr testified that there was a high volume of traffic on the Turner Turnpike, which was not unusual for a weekday at that time of day.

17